Erika Birch (ID Bar No. 7831)
Lauren I. Scholnick (ID Bar No. 7579)
**STRINDBERG & SCHOLNICK, LLC**
802 W. Bannock St., Suite 402
Boise, ID 83702
Telephone: (208) 336-1788
Facsimile: (208) 287-3708
*erika@idahojobjustice.com*
*lauren@utahjobjustice.com*

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LEONARD CLAUNTS, JOSEPH HUFF, CURTIS SHANKEL, and GINGER CLAUNTS<br><br>      Plaintiffs<br><br>vs.<br><br>NAMPA CITY POLICE DEPARTMENT, CITY OF NAMPA, a political subdivision, CHIEF WILLIAM AUGSBURGER, in his individual and official capacity, MAYOR TOM DALE, in his individual and official capacity, DEPUTY CHIEF CRAIG KINGSBURY, in his individual and official capacity, and JOHN DOES I –XX,<br><br>      Defendants | **COMPLAINT AND JURY DEMAND**<br><br>CASE NO: 11-CV-457<br><br>JUDGE: |

Plaintiffs Leonard Claunts, Joseph Huff, and Curtis Shankel (collectively referred to as "officer Plaintiffs"), and Ginger Claunts complain and allege against Defendants as follows:

**NATURE OF CASE**

1.      This is an action for injunctive and declaratory relief, and damages, due to the

retaliatory conduct of the Defendants against the Plaintiffs, which continues and is ongoing,

because of Plaintiffs' protected speech and whistleblowing activities. The Defendants have

violated the Plaintiffs' rights protected by the Idaho Public Employee Protection Act, and the First

Amendment of the U.S. and Idaho Constitutions.

**PARTIES, JURISDICTION AND VENUE**

2.      Plaintiff Leonard Claunts ("Inv. Claunts") is an individual residing in Caldwell,

Idaho and is an Investigator/sworn police officer at Nampa Police Department.

3.      Plaintiff Joseph Huff ("Lt. Huff") is an individual residing in Nampa, Idaho and is a

Lieutenant/sworn police officer at Nampa Police Department.

4.      Plaintiff Curtis Shankel ("Sgt. Shankel") is an individual residing in Nampa, Idaho

and is a Sergeant/sworn police officer at Nampa Police Department.

5.      Plaintiff Ginger Claunts ("Mrs. Claunts") is an individual residing in Caldwell,

Idaho and is married to Inv. Claunts.

6.      Defendant City of Nampa ("City") is political subdivision, incorporated in 1891,

and an employer as defined by Idaho Code § 6-2103.

7.      Defendant Nampa Police Department ("NPD") is department within the City, also

an employer as defined by Idaho Code § 6-2103.

8.      Defendant William Augsburger is the Chief of Police at NPD, and resides in

Nampa, Idaho.

9.      Defendant Tom Dale is the Mayor of Nampa City and resides in Nampa, Idaho.

10.     Defendant Craig Kingsbury is a Deputy Chief at PNR and resides in Nampa, Idaho

11.     John Does I – XX, are individual NPD and City Officials who have instigated, ordered and/or participated in the pattern and practice of retaliation against Plaintiffs because of their protected activities.

12.     The conduct complained herein occurred in Canyon County, State of Idaho.

13.     This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to state law claims.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b) and (c).

## NOTICE OF CLAIM

15.     Plaintiff Inv. Claunts filed a notice of claim pursuant to I.C. § 50-219 on June 30, 2011.  At least ninety (90) days has elapsed since that notice was served on the City.

16.     Plaintiffs Lt. Huff and Sgt. Shankel filed their § 50-219 notice of claim on September 1, 2011.   Upon the expiration of 90 days, Plaintiffs will amend this Complaint to add claims for these two Plaintiffs under the IPEPA.

## GENERAL ALLEGATIONS

17.     Plaintiffs Claunts, Huff and Shankel are long-time law enforcement officers at Nampa Police Department.   In good faith, they have been raising concerns about the Departments' waste of taxpayer funds and public safety.   The Department and the City have ignored those concerns and have instead chosen to engage in a campaign of retaliatory harassment against Plaintiffs as further set forth below.

18.     Inv. Claunts has worked as a police officer for the NPD since November of 1994, nearly 17 years.

19.     Lt. Huff has worked as a police officer for the NPD since October of 1993, for nearly 18 years, after serving as a reserve officer for NPD for several years.

20.     Sgt. Shankel has worked as a police officer for the NPD for over 13 years since June of 1998.

21.     All three officers are long-term, dedicated public servants who strive to uphold the core values of the City including to "guard the public trust" and "practice integrity and accountability at all times."

22.     In mid-2009, all three officers were assigned to the Internal Affairs ("IA") section of the NPD's Office of Professional Standards ("OPS"). Sgt. Shankel and Inv. Claunts where responsible for conducting internal investigations of their fellow officers and reported to Lt. Huff and ultimately to Chief Augsburger.

23.     Officer Plaintiffs became aware of concerns within the department as part of an internal survey Inv. Claunts and Sgt. Shankel were asked to perform in the latter part of 2009. One of the concerns voiced by the lower ranks of the department was that Lieutenants appeared to be abusing their exempt status (salaried without overtime/comp-time) by working less than 40 hours a week.

24.     During this timeframe (late 2009/2010) Plaintiffs also became concerned about particular officers' misconduct on and off the job. They recommended to Chief Augsburger that discipline be initiated and perhaps criminal charges filed in certain cases. As examples:

        a.  One officer had multiple discipline issues including failure to supervise and unsatisfactory performance, had been found guilty of disconnecting his GPS system on his patrol car and spending shift time at home, and had been involved in multiple domestic violence reports and 911 calls.

    b.   Another officer, who had use-of-force issues in his past, used excessive force when dealing with a suspect, which was witnessed and reported by a fellow officer.

    c.   Another officer was running his personal business during his department shifts using department equipment, for example delivering and picking up orders during his work time.

    d.   Another officer had been showing up for work under the influence of alcohol and under the supervision of the safety officer and trainer who failed to take action.

25.    Chief Augsburger ignored IA's recommendations for discipline and opted to issue no or little discipline to these officers.

26.    Frustrated with the Chief's failure to take appropriate action, Lt. Huff went outside his normal work duties and wrote a memo directly to the Chief on June 1, 2010 outlining specific concerns he had with the officer referenced in paragraph 24a above citing the officer's misconduct over a 15 month period.   In this memo, Lt. Huff raised concerns including the misuse of public equipment and resources and possible endangerment of public safety by not making sure that the police officers were being appropriately and adequately supervised.

27.    Chief Augsburger did not respond to the memo. Instead, less than 30 days later, on June 29, 2010 he chose to remove Lt. Huff from his responsibilities as the Lieutenant in IA.   The Chief informed Inv. Claunts and Sgt. Shankel that they now reported directly to him.

28.    Later that year, Sgt. Shankel and Inv. Claunts also frustrated with how the Chief was ignoring serious issues, went outside their normal course of duties and wrote a memos to the Chief highlighting their concerns.   For example, in September and October, they send a memo raising concerns about why a particular Sergeant was not being appropriately disciplined (and

criminal charges considered) after it had been established that he had used excessive force during an arrest.

29.     Chief Augsburger did not respond and instead cleared the offending Sergeant to return to normal duty.

30.     Plaintiffs also became aware that the Chief of Police and other command staff (including a Deputy Chief) golfed during working hours. And they learned that certain supervisors (Lieutenants and Deputy Chiefs) were performing school related tasks (homework and studying) while on duty.

31.      Plaintiffs were concerned that the actions of their superiors violated City policy and were a misuse of public funds as they were getting paid while not working. Policy #7000 states that exempt employees who are absent from work for personal reasons other than sickness or disability will not be paid for that time.

32.     However, there had also been a long-standing practice (and unwritten policy) to allow exempt employees (those employees paid a salary and not entitled to overtime or comp-time pay) within the NPD, including Lieutenants, to take "flextime" for hours worked over 40 hours per week. For example, if a Lieutenant worked over 40 hours in a week, he was then permitted to take paid time off equal to the "overtime" as "flextime."

33.     When Lt. Huff became a Lieutenant he was informed by one of the Deputy Chiefs about this flex leave policy and just told to "keep track" of his overtime and flextime.

34.     Plaintiffs became concerned that this policy was being violated because the Lieutenants were not being required to accurately track their time. Not only that, but the Lieutenants were abusing the department's policy by taking more time-off than they had actually accrued.

35.     During 2010, officer Plaintiffs repeatedly discussed with their superiors, including but not limited to the Chief and the Deputy Chiefs, that the command staff appeared to be abusing their rank and violating policy by, among other things, golfing during working hours, performing school work during working hours, taking personal time off and requesting (and receiving) full pay under the NPD's flextime policy while working less than 40 hours a week.

36.     Plaintiffs' concern was not only about a waste of taxpayer dollars, but also for public safety as many times police officers were left unsupervised and without proper supervisory support.

37.     Because their complaints within their chain of command in the Department were being ignored and had resulted in retaliation, Sgt. Shankel wrote an "anonymous" letter to the Mayor and the City Council members on or about November 2, 2010. This letter detailed many of the concerns that the Plaintiffs had been trying to get the NPD to address for months.

38.     Plaintiff Ginger Claunts, Inv. Claunts' wife, also wrote an email to the City's Director of Human Resources, Ed Simmerman ("Mr. Simmerman"), on November 4, 2010, which set forth similar issues of public safety and waste and misuse of taxpayer funds. The email stated that her concerns could be verified by her husband, Sgt. Shankel and Lt. Huff, although none of them were aware that she had sent the email. Inv. Claunts and Lt. Huff were aware that Sgt. Shankel had mailed the anonymous letter, although they did not take part in drafting it.

39.     On November 4, at 4:31 pm, Mr. Simmerman responded to Mrs. Claunts stating that he "will look into matters (probably with the mayor's office) in a very discrete manner."

40.     Less than 24-hours later, Mr. Simmerman, instead of discretely investigating her complaint, chose to contact Chief Augsburger and tell him about Mrs. Claunts' email. On November 5, Mr. Simmerman wrote:

Chief: I'm sorry I didn't get to see you yesterday. I need to talk to you before Tuesday. I received a completely different communication than the one the mayor received and you and I need to converse about it. As you I hope know me well enough, I certainly am not going to perform a witch hunt. However, I want to be very well versed so that we're covered on all bases.

41.     The Chief requested a copy of the complaint. When Mr. Simmerman asked if he should remove the sender's name, Chief Augsburger said, "to be honest with you, I would send it whole as I am retaining council [sic]."

42.     On November 9, 2010 Chief Augsburger announced to the dispatch supervisor in front of Lt. Huff, something to the effect of "I was slandered this weekend and I'm going to fire two people today… people are going to get fired over this one." Lt. Huff also overheard the Chief telling other patrol officers that that he had been slandered over the weekend and had retained a lawyer and was going to sue people.

43.     Later that same day, during the command staff meeting, Chief Augsburger walked into the meeting and angrily stated, "I want everyone to leave this room except [Sgt. Shankel] and [Officer Claunts]." When the other employees had left, Chief told Inv. Claunts and Sgt. Shankel that he was going to sue them and that their home owners insurance would have to kick in and pay $100,000. At the end of the meeting he stated that the Claunts would be receiving a letter from his attorney.

44.     After this meeting, the Chief held another command staff meeting, but excluded Sgt. Shankel and Inv. Claunts, and proceeded to read the complaint letters to the staff present which included Lt. Huff. He also told them that he and Deputy Chief Kingsbury had lawyers and advised the rest of the staff to decide if they were also going to retain counsel. At the end of the meeting, the Chief ordered Lt. Huff to meet with him.

45.     The Chief proceeded to accuse Lt. Huff of keeping records on him and the command staff and told him it did not look good that he was identified in Mrs. Claunts' email.

46.     Due to the Chief's threats and because of a concern for Officer Claunts' continued employment, Mrs. Claunts sent an email on November 10, 2010 to Mr. Simmerman stating "For the well being of my family, I am withdrawing the attached email titled SOP Violations."

47.     Mr. Simmerman also chose to share this email with Chief Augsburger, who then forwarded a copy of it (including a copy of Mrs. Claunts' original complaint), to members of his command staff, including all of the Lieutenants.

48.     Inv. Claunts attempted to mend fences, and hopefully avoid being sued and/or fired, by apologizing to the NPD leaders for his wife's email.   Inv. Claunts made clear that although he was upset that she had sent the email, he agreed that the concerns she raised in that email were real and needed to be addressed.

49.     The Chief told Inv. Claunts that he accepted his apology. Nonetheless, he went ahead and directed his attorney to still send a threatening letter to the Claunts. The Claunts later received letters from an attorney representing Chief Augsburger (in November 2010 and again in January 2011) and an attorney representing Deputy Chief Kingsbury (on December 21, 2010) threatening to sue Mrs. Claunts for defamation and demanding she retract her complaint and pay attorneys fees. The Claunts were forced to retain counsel to respond to these letters.

50.     Not only did the Chief have his lawyers threaten litigation, but he chose to retaliate against the Plaintiffs. For example:

   a.     On November 16, 2010 the Chief had Lt. Huff transferred from investigative services back to patrol. The following day Deputy Chief

Kingsbury stripped Lt. Huff of his office and switched his department vehicle.

b.  The Defendants then moved Lt. Huff again to a new, and less favorable, assignment in August 2011, despite the fact that it was NPD practice to keep Lieutenants in assignments for 2 years.

c.  The Chief also decided to take away most of Sgt. Shankel and Officer Claunts' work, and assigned other officers or outside agencies to handle IA cases.

d.  The Chief and the NPD also intentionally gave Lt. Huff a performance review that was negative and contained a low rating. This occurred, even though Lt. Huff has had positive performance evaluations in his prior 18 years with the Department. Lt. Huff tried to get the Chief to change and correct the appraisal, but the Chief chose not to make any substantive changes.

e.  The Chief also began to closely monitor and scrutinize the Plaintiffs' work. For example, in March of 2011 the Chief wrote, "I need to know what [Sgt. Shankel] and [Officer Claunts] are doing on a daily basis." Such day to day scrutiny had never previously been done by the Chief.

f.  The Chief has also decided to continue to make threatening and retaliatory statements towards the Plaintiffs.   For example: On December 15, 2010 Chief Augsburger told Sgt. Shankel during an administrative meeting that he could be without a job next year. On March 7, 2011, Chief Augsburger

told Sgt. Shankel and Inv. Claunts that they work for him and if there were

layoffs they would be figured into layoffs.

g.   On December 22, 2010, Chief Augsburger saw Sgt. Shankel in a new police

vehicle and told him that he didn't want him to have that car and he would

replace it with the highest mileage patrol car. Within a day or two, Sgt.

Shankel's car was taken away and he had to carpool for several days until

he was provided with an older replacement car.

h.   On April 27, 2011 the Chief directed Sgt. Shankel and Inv. Claunts to move

out of their office and into a 12' x 12' room located approximately 20 feet

from his office. Members of the Department, including the command staff

have also begun to refer to the plaintiffs and a few other officers who have

stepped forward in support as "the Satan Six."

i.   In late April, the Chief confronted Inv. Claunts about supposedly not

logging in and out properly. This occurred even though the Chief has access

to a radio log that would have shown Inv. Claunts' log in and out times.

51.   Upper management in the Department has also decided to alienate and segregate

the Plaintiffs.   For example, Lt. Huff recently asked Deputy Chief Forsman if he wanted to go to

coffee. Chief Forsman initially said yes until he found out that Sgt. Shankel and Inv. Claunts

would also be going and then he quickly declined. Additionally, the administrative staff routinely

refuses to talk to or even acknowledge the Plaintiffs.   This has filtered down to the officer ranks,

as patrol officers have expressed they do not want to be seen talking with Plaintiffs

52.     Although the issues of waste and public safety were reported in November of 2010, the Director of Human Resources, the Mayor and all of the City council members chose not to take any action or to even investigate the complaints throughout the winter and into the spring.

53.     Five months after the reports had been made, on or about April 5, 2011, Sgt. Shankel met with Mr. Simmerman, City HR Director. Mr. Simmerman told Sgt. Shankel that he had been asked by the Mayor and City Council member Curtis Homer to look into the issues raised in the November complaints. He also admitted that he was inexperienced in conducting this type of investigation.

54.     Sgt. Shankel agreed to provide information in support of the complaints and also made clear to Mr. Simmerman that he, Inv. Claunts and Lt. Huff were being retaliated against because of the November complaints.   He suggested that Mr. Simmerman also talk to Lt. Huff. Mr. Simmerman asked Sgt. Shankel to ask other officers to come in and talk with him and/or the Mayor about their concerns and promised that he would keep these interviews confidential.

55.     Lt. Huff met with Mr. Simmerman later that day. Mr. Simmerman told Lt. Huff the he was concerned that he, Sgt. Shankel and Inv. Claunts were being retaliating against because of the letter/email and wanted to talk with him as part of his investigation.

56.     All three officers thought the investigation was being conducted by the HR Director at the behest of the Mayor (and possibly the city council) during early April. Each Plaintiff met individually with Mr. Simmerman and with Mayor Dale, and outlined and reiterated their concerns.

57.     They all also disclosed to Mr. Simmerman and the Mayor that they were being retaliated against because of the complaint letters. The Plaintiffs hoped that some remedial action would be taken in response to their complaints of waste, safety concerns and retaliation.

58.     Unfortunately, the City has chosen not to take any remedial action. Upon hearing that this was the case, Lt. Huff met with Mr. Simmerman in mid/late-April for confirmation. Mr. Simmerman confirmed that he had "no instructions to do anything else," that the Mayor was not going to further investigate, and admitted that he was "disappointed" in the way the investigation had been handled but that his "hands are tied." Mr. Simmerman told Lt. Huff that "everything is in the Chief's hands per the Mayor." Lt. Huff made clear that he was disappointed in the investigation and results.

59.     On April 21, 2011 the Chief announced his retirement (which was already planned prior to the complaints) effective October 31, 2011.

60.     Since then the Chief has chosen not to take any steps to correct the problems, to stop the misuse of public assets, or to insure that the department was adequately protecting the citizens of Nampa. Instead, the Chief has chosen to further retaliate against the Plaintiffs.

61.     On August 29, 2011 all three officer Plaintiffs were served with "Personnel Notices" from the Chief and told by Canyon County Deputy Chief Gary Duelen that he was conducting an IA investigation against them.

62.     The Personnel Notices that the officer Plaintiffs initially received did not comport with NPD's usual practice of specifically identifying what potential policy violations were at issue in the IA.

63.     All three officers were interviewed by Chief Duelen on September 9, 2011, as part of this ill defined IA investigation.

64.     It became apparent during the interviews that officer Plaintiffs were being subjected to an IA not for having done anything wrong, but rather for having made the complaints about misuse of public funds and endangering public safety.

65.     In other words, it is clear that the Chief and the NPD have ordered the IA because of Inv. Claunts', Lt. Huff's and Sgt. Shankel's protected activity and to further retaliate against them.

66.     It should be noted, that prior to making their complaints of waste and safety issues, the officer Plaintiffs have consistently received positive feedback from their superiors, including receiving good performance evaluations on a regular basis. Inv. Claunts has been recognized as "officer of the year" on more than one occasion, he has received commendations, letters of recognition, letters of thanks from citizens, and letters of appreciation. Sgt. Shankel has likewise received commendation and recognition for his law enforcement activities. And, Lt. Huff has also received commendations and letters from citizens complimenting his performance. All three officers have received the "good conduct" medals in recent years, and Lt. Huff and Inv. Claunts also received a unit citation medal recognizing their good performance.

## FIRST CAUSE OF ACTION
### (All Officer Plaintiffs vs. All Defendants for violation of the First Amendment of the U.S. Constitution)

67.     Plaintiffs incorporate the allegations of the above paragraphs herein.

68.     Officer Plaintiffs spoke out on matters of public concern including misuse/waste of public funds, inefficiency in managing and operating the NPD, and public safety concerns as outlined above.

69.     These concerns were raised with the Chief of Police, Defendant Augsburger, City Human Resources Director Ed Simmerman, Mayor Tom Dale, and City Council members. Inv. Claunts' wife also spoke out on matters of public concern in her email to HR Director Simmerman and identified the Plaintiffs as people who could validate her concerns.

70.     These concerns were raised orally and in writing, and in a manner that was minimally, if at all, disruptive, to the operations of the Department and the City.

71.     Officer Plaintiffs' speech was not made pursuant to their official duties.

72.     Officer Plaintiffs have suffered and continue to suffer an ongoing pattern of adverse actions as a result of having exercised their rights to free speech.

73.     These adverse actions were and are reasonably likely to deter Officer Plaintiffs from engaging in protected activity under the First Amendment.

74.     Officer Plaintiffs' protected speech was a motivating factor in the adverse employment actions suffered by them. Mrs. Claunts' protected speech was also a motivating factor in the adverse employment actions suffered by her husband, Inv. Claunts. Moreover, the City has admitted that the officer Plaintiffs' protected speech resulted in the retaliation they suffered. For example, within days of receiving notice of the email and letter, the Chief stated he was going to fire people for having raised the concerns. The Director of HR also freely admitted that he knew the officers had been retaliated against because of Mrs. Claunts' email and Sgt. Shankel's letter, but that his hands were tied.

75.     Additionally, the Chief threatened to sue Inv. Claunts and Sgt. Shankel, encouraged others on the command staff to retain lawyers, and in fact, had his attorney send several letters threatening to sue Mrs. Claunts.

76.     The Defendants did not have adequate justification for treating officer Plaintiffs differently from other members of the general public.

77.     The Defendants would not have taken the adverse actions absent the protected speech.

78.     At all times relevant hereto, Defendants acted under color of law when committing the acts complained of.

79.     Defendants' retaliatory conduct violated the clearly established constitutional right of free speech, and the right to petition the government for redress, rights which a reasonable person would have known.

80.     As a result of Defendants' actions, officer Plaintiffs have suffered and will continue to suffer losses including severe emotional distress.

81.     Officer Plaintiffs are entitled to injunctive and prospective relief pursuant to 42 U.S.C. § 1983 including but not limited to an order prohibiting further retaliation, and attorneys fees and costs against Defendants Augsburger, Dale and Does I- XX in their official capacity.

82.     Additionally, Officer Plaintiffs are entitled to compensatory damages as against these same Defendants in their individual capacity.

## SECOND CAUSE OF ACTION
### (All Officer Plaintiffs vs. All Defendants for violation of the Article I Section 9 of the Idaho Constitution)

83.     Plaintiffs incorporate the allegations of the above paragraphs herein.

84.     Officer Plaintiffs spoke out on matters of public concern including misuse/waste of public funds, inefficiency in managing and operating the NPD, and public safety concerns as outlined above.

85.     These concerns were raised with the Chief of Police, Defendant Augsburger, City Human Resources Director Ed Simmerman, Mayor Tom Dale, and City Council members. Inv. Claunts' wife also spoke out on matters of public concern in her email to HR Director Simmerman and identified the Plaintiffs as people who could validate her concerns.

86.      These concerns were raised orally and in writing, and in a manner that was minimally, if at all, disruptive, to the operations of the Department and the City.

87.     Officer Plaintiffs' speech was not made pursuant to their official duties.

88.     Officer Plaintiffs have suffered and continue to suffer an ongoing pattern of adverse actions as a result of having exercised their rights to free speech.

89.     These adverse actions were and are reasonably likely to deter Officer Plaintiffs from engaging in protected activity under the First Amendment.

90.     Officer Plaintiffs' protected speech was a motivating factor in the adverse employment actions suffered by them. Mrs. Claunts' protected speech was also a motivating factor in the adverse employment actions suffered by her husband, Inv. Claunts. Moreover, the City has admitted that the officer Plaintiffs' protected speech resulted in the retaliation they suffered. For example, within days of receiving notice of the email and letter, the Chief stated he was going to fire people for having raised the concerns. The Director of HR also freely admitted that he knew the officers had been retaliated against because of Mrs. Claunts' email and Sgt. Shankel's letter, but that his hands were tied.

91.     Additionally, the Chief threatened to sue Inv. Claunts and Sgt. Shankel, encouraged others on the command staff to retain lawyers, and in fact, had his attorney send several letters threatening to sue Mrs. Claunts.

92.     The Defendants did not have adequate justification for treating officer Plaintiffs differently from other members of the general public.

93.     The Defendants would not have taken the adverse actions absent the protected speech.

94.     At all times relevant hereto, Defendants acted under color of law when committing the acts complained of.

95. Defendants' retaliatory conduct violated the clearly established constitutional right of free speech, and the right to petition the government for redress, rights which a reasonable person would have known.

96. As a result of Defendants' actions, officer Plaintiffs have suffered and will continue to suffer losses including severe emotional distress.

97. Officer Plaintiffs are entitled to injunctive and prospective relief pursuant to 42 U.S.C. § 1983 including but not limited to an order prohibiting further retaliation, and attorneys fees and costs against Defendants Augsburger, Dale and Does I- XX in their official capacity.

98. Additionally, Officer Plaintiffs are entitled to compensatory damages as against these same Defendants in their individual capacity.

### THIRD CAUSE OF ACTION
**(Plaintiff Ginger Claunts vs. Defendants Augsburger and Kingsbury in their official and individual capacities for violation of the First Amendment of the U.S. Constitution)**

99. Plaintiff Mrs. Claunts incorporates the allegations of the above paragraphs herein.

100. Mrs. Claunts' exercised her First Amendment right to petition the Government for redress of grievances by raising matters of public concern including misuse/waste of public funds, inefficiency in managing and operating the NPD, and public safety concerns as outlined above.

101. This petition was made in an email to the City Human Resources Director Ed Simmerman.

102. Although Mr. Simmerman told Mrs. Claunts that her concerns would be looked into discretely, a copy of her email was forwarded to Chief Augsburger who informed Mr. Simmerman that he had retained council.

103.    Instead of responding to Mrs. Claunts' concerns, she has suffered and continues to suffer an ongoing pattern of adverse actions as a result of having exercised her First Amendment rights.

104.    These adverse actions including receiving letters threatening to sue her for defamation from attorneys representing Defendant Augsburger and attorneys representing Defendant Kingsbury.   These adverse actions also include the retaliatory act assert against her husband, Inv. Claunts, as outlined above.

105.    At all times relevant hereto, Defendants acted under color of law when committing the acts complained of.

106.    Defendants' retaliatory conduct violated Mrs. Claunts' First Amendment rights which are clearly established and which a reasonable person would have known.

107.    As a result of Defendants' actions, Mrs. Claunts have suffered and will continue to suffer losses including attorneys' fees and severe emotional distress.

108.    Mrs. Claunts is entitled to injunctive and prospective relief pursuant to 42 U.S.C. § 1983 including but not limited to an order prohibiting further retaliation against herself and her husband, and attorneys fees and costs against Defendants Augsburger and Kingsbury in their official capacity.

109.    Additionally, Mrs. Claunts is entitled to compensatory damages as against these same Defendants in their individual capacity.

### FOURTH CAUSE OF ACTION
**(Plaintiff Claunts vs. NPD and the City for violation of the IPEPA)**

110.    Inv. Claunts incorporates the allegations of the above paragraphs herein.

111.    Inv. Claunts was an employee who engaged in protected activity.

112.    Inv. Claunts communicated in good faith concerns about the existence of waste of public funds and/or manpower and suspected violations of a laws, rules or regulations as protected under Idaho Code § 6-2104(1)and as outlined above.

113.    Inv. Claunts provided information about governmental waste and misuse of governmental funds both to the Director of Human Resources and Defendant Dale. His communications about these concerns are protected under Idaho Code § 6-2104(2), and an employer may not take adverse action against the employee for having made the communications.

114.    Because of his communications, Defendants have taken adverse actions against Inv. Claunts affecting his employment, including the terms, conditions, location of his employment as outlined above.   These actions have also interfered with his ability to perform his job in a productive manner and will have lasting implications on his future assignments, promotions and employment opportunities.

115.    There is a causal connection between the protected activity and the Defendant's adverse actions.

116.    Inv. Claunts seeks all available injunctive relief, including an order preventing further retaliatory actions, any actual damages he has suffered or will suffer as a result, as well as costs and attorney fees, and any other relief allowed under Idaho Code § 6-2105

## **JURY DEMAND**

Plaintiffs, pursuant to Fed. R. Civ. P. 38, hereby demand a trial by jury of any issue triable of right by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays for judgment against Defendants as follows:

1.    For injunctive relief requiring Defendants to immediately cease any and all

retaliatory conduct, to return Plaintiffs to the positions and status they held prior to the start of the retaliation, to rewrite the negative reviews they received, to immediately end the IA investigation and otherwise repair the damage to their reputations, good names and careers;

2.       For an order and judgment against Defendants for appropriate damages due to damage to Plaintiff's reputation, career and future job opportunities and/or for any other of Plaintiff's pecuniary losses;

3.       For compensatory damages to compensate Plaintiffs for their emotional distress, loss of enjoyment of life, and other non-pecuniary losses in amounts to be established at trial;

4.       For Plaintiffs' reasonable attorneys' fees and costs of court;

5.       For punitive damages in substantial, appropriate, and reasonable amounts;

6.       For such further and other relief the court deems appropriate.

DATED this 29th day of September, 2011

**STRINDBERG & SCHOLNICK, LLC**

/s/ Erika Birch
Attorneys for Plaintiffs